*643 OPINION OF THE COURT
W. Dennis Duggan, J.
The matter before the court is the respondent father’s motion for summary judgment, seeking to dismiss the mother’s petition for modification of the parties’ custody and visitation order.
The legal question to be resolved in this case is whether the blackletter law standard for granting summary judgment in civil cases applies without alteration to modification of child custody cases. The court finds that it does not and a different standard applies.[2] The court holds that, on a summary judgment motion in a child custody modification case, the court is permitted to search not only the record before it as contained in the moving papers, but also the entire case record and the court’s own historical memory of the case. The court’s historical memory is the product of having presided over the prior, on-the-record, appearances of the parties, and of having reviewed the previous pleadings and affidavits filed in support of those proceedings and the various court-ordered assessments and evaluations submitted to the court. The use of these available records and resources is not only helpful, but essential to the court. Their use enables the court to evaluate each party’s allegations and put them in the proper context as they relate to the children’s best interest at this point in time.
To briefly restate the blackletter law on summary judgment one cannot improve on quoting Professor Siegel:
“CPLR 3212 allows the court on motion to grant summary judgment for a party. The grant means that the court, after going through the papers pro and con on the motion, has found that there is no substantial issue of fact in the case and therefore nothing to try. Summary judgment is often termed a drastic remedy and will not be granted if there is any doubt as to the existence of a triable issue. As the procedural equivalent of a trial, it is used sparingly. When saved for a proper case it is a perfectly constitutional weapon. It does not deny the parties a trial; it merely ascertains that there is nothing to *644 try. Rather than resolve issues, it decides whether issues exist. As is often said of the motion, issue finding rather than issue determination is its function.” (Siegel, NY Prac § 278, at 438 [3d ed].)
One reason that the law of summary judgment, as it applies to custody cases, should be different from that as applied to “ordinary” civil cases is that there are children involved. Indeed, they are not just involved, they are, by any measure, the main parties in interest. However, they are silent parties and for this reason the court must give special considerations to a summary judgment motion made in a custody case.
Professor Siegel notes that “If a main element in the case is a highly subjective one, such as fraud (because of the investigation of intent that it entails), the case is likely to be unsuitable for summary judgment” (Siegel, op. cit., at 439, citing Falk v Goodman, 7 NY2d 87). Considering this, it immediately comes to mind that there are few, if any, more subjective standards in the law than that of the “best interests of the child.” One could infer from the principle enunciated in Goodman that summary judgment is seldom or ever appropriate in custody modification cases. However, for other valid reasons, just the opposite is the case.
Every Family Court Judge in this (and every other) State knows from experience that protracted custody litigation is poisonous to children’s emotional (and often physical) health. Social scientists have empirically verified this experience and the court has specific evidence in the record in this case to support such a conclusion with respect to the LL. children.[3] A *645 Family Court Judge occupies a unique position to view a family’s emotional health. Under our one family-one Judge system, the assigned Judge virtually lives through the often protracted and always painful family conflicts that face the children. The court sees the parents on a regular basis, sometimes once a month for a year or more. We are provided with forensic psychological reports, family assessments, home studies, CASA reports, Department of Social Services investigative reports, substance abuse reports, medical records, school records, Law Guardian reports, and legal memoranda. The court is made privy to a family’s most private behaviors. With this information, the court arms itself to protect the children. Just as in old England, where the jurors were chosen from the community because they knew the parties and the facts of the case, a Family Court Judge often brings to a case a large and long institutional memory and a history of having literally managed the conflict, in the most detailed respects, over long periods of time. Put this way, the question presents itself as follows: Would the law require a Family Court Judge to discard this historical record, erase his or her memory and approach the case as a blank slate, relying just on the papers placed before it on the motion? The answer is no, simply because that would not be in the children’s best interest.
In searching this expanded record, the trial court must be mindful that “ ‘alteration of an established custody arrangement will be ordered only upon a showing of sufficient change in circumstances reflecting a real need for change in order to ensure the continued best interest of the child’ ” (Kelly v Sanseverino, 278 AD2d 535, 536 [3d Dept 2000], quoting Matter of Van Hoesen v Van Hoesen, 186 AD2d 903). “Absent some indication that such a change will substantially enhance the child’s welfare and that the custodial parent is unfit or less fit to continue as such, an established custody arrangement should not be disturbed” (Kelly, supra, at 536). Using this standard to provide the filter through which the evidence in a child custody case must pass, it is clear why the usual “issue find *646 ing” summary judgment test is too narrow to protect children from the corrosive effects of sequential custody litigation.
The appellate courts have long held that a hearing is not necessary when the court possesses sufficient information to undertake an independent review of the children’s best interest (Matter of Hermann v Chakurmanian, 243 AD2d 1003, 1004; Matter of Shabazz v Blackmon, 274 AD2d 770 [3d Dept]).
An independent review of the expanded record in this case reveals a pattern of custody litigation which, as noted above, is so harmful to the children.[4] The LL. parents have petitioned Family Court 21 times in the last four and one-half years. These 21 petitions have generated 36 court appearances. This is an appearance about every six weeks for more than four years. This comes after the parents went through their divorce proceedings! The divorce proceedings carry a 1993 index number which means that these parents have been litigating these issues for almost eight years. This is about 75% of their children’s lives. These appearances have resulted in 19 court orders. Supporting these orders (almost all on consent) are a number of psychological reports, including a full forensic psychological evaluation done in October 1997, running 22, single-spaced, typed pages. The court also has available to it three recent psychological reports from the three therapists treating the family.
In granting summary judgment for the father, the court has made an extensive search of this extensive record. The court finds that the affirmations of the mother that can truly be claimed to constitute a change in circumstances, accepting them as proven, would not support a finding that it would be in the best interests of the children to alter the established custodial arrangement.
The current custody and timesharing arrangement existing between the parents has been in place, without any major alterations, since stipulated to by the parents in their divorce proceedings in August 1995. For this reason alone, the mother *647 would have a heavy burden to show why a five-year existing custodial relationship should be changed.[5]
In opposing this motion for summary judgment, the mother alleges in her complaint that the father has engaged in uncivil behavior towards her consisting of phone hang-ups, caller ID screening and a failure to return phone calls and letters. While the mother may be able to prove a failure to communicate by the father, her allegations are broad-brushed without any reference to date, time or specific fact content. In addition, the court’s review of the record shows that these types of allegations have been consistently made by both parents over the last four years. Finally, the mother does not claim that the failure of the father to communicate in a civil manner prevented the parents from making important joint custodial decisions. Neither would her claims support any reduction in the father’s custodial time. One of the few specific allegations made by the mother is that, in November and December 1999, the father yelled at and belittled the mother at the boys’ basketball game at school. She also claims that, in January 2000, the father yelled at their son in the hall at school. These three incidents, now almost a year past, would not, when aggregated with the mother’s other claims, support a change in custody.[6]
The mother makes other allegations that the father does not help the children with their homework, involve the children in church activities or take the children for routine medical and dental appointments and swimming lessons. Instead, the mother states she does these things. As noted above, there is no fact-specific content to the mother’s claims so there is no way to determine if these claims constitute a change of circumstances from the previous order. Also, it is not in any way clear how a change in the custodial arrangement would change *648 things for the better for the children. The mother does not claim that the father’s joint custodial authority or parenting time prevented her from attending to the children’s needs. The mother also makes a broad-based claim that “the children’s education is being compromised.” However, the claim is unsupported by any facts, such as school reports.
The mother also claims that the father has not cooperated with the psychological counseling program arranged to treat the family. In this regard, the parents agreed, in July of 1999, to engage Karner Psychological Associates. Each parent would have his or her own counselor and the . children would also have a counselor. On August 30, 2000, the children’s counselor reported as follows:
“Both [boys] do not present with any behavioral pathology that would seem to benefit from any ongoing treatment * * * In my contact with [the father], I saw nothing to suggest that he couldn’t adequately parent or care for his children * * * The apparent hostility between [the mother] and [the father] seems to be the greatest negative factor [a]ffecting the children’s psychological well being * * * It is my impression that it is not possible to counsel effectively with these parents as they seem unable to work in a reasonable way with each other.”
The father’s counselor reported the following:
“I have not seen any reason why he should not continue to be very involved with his sons’ upbringing * * * Unless [the mother] knows of some extreme suffered by the children due to their contact with their father (of which neither I nor the children’s counselor is aware oí) I do not see how these repeated attempts at changing the custody arrangement are of any significant benefit to anyone. At this point in time, my impression is that therapy has pretty much ended for this family * * * Therefore, it is perhaps time for the Court to strongly encourage / insist that these parents quit returning to court trying to change the custody arrangement. Perhaps if they did not see court modification of their agreement as a possibility, they might feel more motivated to try to make the best of the current arrangement. Maybe at that point counseling could be of some use again — with a clearer focus for everyone that the purpose of the counseling is *649 simply to make the best of the situation as it is, not to use it for leverage in changing the custody order.” (Emphasis added.)
The mother’s counselor reported as follows:
“[The mother] presented with considerable anxiety relative to the well being and future of her children * * * I can tell you that it is my impression that the greatest difficulties these children have, and will likely continue to have, is the fact that their parents cannot sit in the same room with each other, never mind discuss with civility and reasonableness decisions regarding the care and well being and logistics. Unfortunately, their youth is being squandered and defined by the hostility between their parents and this will ultimately [a]ffect their psychological well being.”
These very recent reports provide no support for a change in custody in the mother’s favor.
The most serious claim for a change in custody is the representation made by the mother that the children have expressed a desire to spend more time with her. This claim is supported and verified by the Law Guardian and the children’s counselor. The boys are now 11 and 12 years old. They are at an age where the court would give reasonable but not deciding weight to their wishes. However, complicating this issue is the mother’s intrusiveness into the children’s free and unimpeded expression of their opinion on this issue.
The mother privately retained an attorney to act as Law Guardian for the children. This ersatz Law Guardian interviewed the children, prepared an affidavit signed by the children, and presented it to the court in support of an order to show cause and modification petition, brought by the children, to restrict the father’s parenting time. This was all done after the mother had filed her own modification petition and after the court had assigned a panel-certified Law Guardian. It was also done without notice to or consent of the father. The court declined to sign the order to show cause and dismissed the petition on the direct authority of Matter of Fargnoli v Faber (105 AD2d 523 [3d Dept 1984]). The mother’s actions were a direct violation of the father’s joint custodial rights and clearly an attempt to steer the litigation in a direction favorable to her. The fundamental unfairness of the mother’s actions, with the added intercession of her boyfriend who was paying for the ersatz Law Guardian, produces, in the court’s judgment, an undue *650 influence on the children.[7] Under the circumstances, this improper action significantly dilutes the validity, genuineness and weight to be attached to the children’s position. Even without this undue influence issue, and giving credence to the mother’s claims, the desires of the children at this point in time would not support changing a five-year existing custodial arrangement.
Based on the court’s independent review of the record, with the children’s best interest foremost in mind, the court finds that the mother has not raised triable issues of fact which, if established, would support a change in custody. Summary judgment is granted for the father and the mother’s petition is dismissed.

. The court is mindful of Family Court-Act § 165 (a) which provides that, if the Family Court Act does not supply a procedure, the CPLR shall apply “to the extent * * * appropriate to the proceedings involved.” So, to the extent that this section applies, the court is holding that the law of summary judgment that undergirds the procedure for summary judgment, in a typical civil case, is not suitable to this custody proceeding.

. On the issue of the damaging effects of custody litigation, see, for example: Richard Weissbourd, The Vulnerable Child (Addison-Wesley Publ Co 1996); James Carrabino, Lost Boys, Why Our Sons Turn Violent and How We Can Save Them (Free Press 1999); David T. Cartwright, The Violent Man, Single Men In Social Disorder From the Frontier to the Inner City (Harvard Univ Press 1996); David Blankenhorn, Fatherless America, Confronting Our Most Urgent Social Problem (Basic Books 1995); David Popenoe, Life Without Father (Free Press 1996); Barbara DeFoe Whitehead and Alfred A. Knopf, The Divorce Culture (1997); Arlene Skolnick, Embattled Paradise, the American Family in the Age of Uncertainty (Basic Books 1991); Christopher Lasch, Haven In a Heartless World, the Family Besieged (W. W. Norton & Co 1977); Penelope Leach, Children First (Vintage Books 1994); Isolina Ricci, Mom’s House, Dad’s House, Making Shared Custody Work (Collier Books 1980); Judith S. Wallerstein and Jone Berlan Kelly, Surviving the Breakup, How Children and Parents Cope With Divorce (Basic Books 1980); Goldstein, Freud, Solner, In the Best Interest of the Child, Beyond the Best Interest of the Child, Before the Best Interest of the Child (Free Press 1986); David Guttman, The Paternal Imperative, The American Scholar *645 (Winter 1998); Sylvia Ann Hewlett, When the Bough Breaks, the Cost of Neglecting Our Children (Harper Perennial Books 1991); Frank F. Furstenberg, Jr., and Andrew J. Cherlin, Divided Family, What Happens to Children When Parents Part (Harvard Univ Press 1991); William Pollock, Real Boys, Rescuing Our Sons From the Myths of Boyhood (Henry Holt & Co 1998); Michael Gurian, The Wonder of Boys (Putnam Books 1997).

. This review of the “expanded record standard” is not meant to be a convenient device for a Family Court Judge to dismiss a petition just because it is filed by a litigious parent. Every Family Court Judge has had the experience of wishing a case would go away because of the feeling: “Oh no, it’s the Bickersons again, they’ll never stop fighting.” When dismissing a modification petition, the court must be able to articulate specific and substantial reasons in the record to support its decision to allow for effective appellate review.

. The mother mistakes the burden of proof on this motion. The father does not have to disprove her allegations. Her allegations, to the extent they have a factual basis, are, for the purposes of this motion, taken as true. Given that, the father is then claiming that the mother’s best case would not support a change in circumstances finding. In short, this is essentially a CPLR 3211 (a) (7), “failure to state a cause of action,” motion being treated as a summary judgment motion. Also, saying that a petitioner has a “heavy” burden does not establish any new burden of proof. It just recognizes that long-established child custodial arrangements will not be lightly overturned (Hessen v Hessen, 33 NY2d 406).

. The mother’s seven-page affidavit in opposition to the father’s motions is nearly all taken up with picking at the father’s claims that, in turn, were picking at hers. It sets forth few nonhearsay fact-based averments to support her position as it exists at this point in time.

. In ascribing an improper motive to the mother, the court notes that the mother is currently under a 30-day suspended jail sentence for admitting that she willfully violated the custodial order in a manner which impaired the father’s parenting rights.